C-122-858<br>
Remand<br>
Slip Op. 22-126<br>
Changed Circumstances Review<br>
Public Document<br>
E&C/OIII:  KJ

***GreenFirst Forest Products and GreenFirst Forest Products (QC) Inc. v. United States***
**Court No. 22-00097, Slip Op. 22-126 (CIT November 18, 2022)**
**Certain Softwood Lumber Products from Canada**

**FINAL RESULTS OF REDETERMINTION**
**PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination in accordance with the opinion and remand order of the U.S. Court of International Trade (CIT or the Court) issued on November 18, 2022, in *GreenFirst Forest Products and GreenFirst Forest Products (QC) Inc. v. United States*, Court No. 22-00097, Slip Op. 22-126 (CIT November 18, 2022) (*Remand Order*).  These final results of redetermination concern Commerce's decision not to initiate and conduct a changed circumstances review (CCR) for GreenFirst Forest Products and GreenFirst Forest Products (QC) Inc. (collectively, GreenFirst) in the countervailing duty (CVD) order[1] on certain softwood lumber products from Canada.[2]  In the *Remand Order*, the CIT remanded Commerce's decision to not initiate the CCR for further explanation or reconsideration.[3]

---

[1] *See Certain Softwood Lumber Products from Canada:  Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 FR 347 (January 3, 2018) (*Order*).
[2] *See* Commerce's Letters, "Countervailing Duty Changed Circumstances Review Request," dated November 16, 2021 (Decision Letter); and "Countervailing Duty Changed Circumstances Review:  Request for Reconsideration of Decision Not to Initiate," dated February 24, 2022 (Reconsideration Letter).
[3] *See Remand Order* at 10.

## II. BACKGROUND

### A. CCR Request

On January 3, 2018, Commerce published the *Order*.[4] On October 4, 2021, GreenFirst requested that Commerce conduct a CCR of the *Order* to determine that GreenFirst is the successor-in-interest to Rayonier A.M. Canada G.P. (RYAM) for the purpose of assigning a cash deposit rate under the *Order*.[5] RYAM has never been individually examined, but was subject to the all-others rate in the investigation and non-selected rate in subsequent administrative reviews.[6] GreenFirst requested that Commerce assign to it the non-selected cash deposit rate of 7.42 percent *ad valorem* that was assigned to RYAM in the most recent administrative review to which it was subject, rather than the all-others cash deposit rate of 14.19 percent *ad valorem* from the investigation and to which GreenFirst's imported merchandise has been subject since August 28, 2021.[7]

On November 16, 2021, Commerce decided not to initiate a CVD CCR based on the facts presented in GreenFirst's submission.[8] In its CCR Request, GreenFirst reported that it acquired full ownership of RYAM's newsprint mill and six sawmills on August 28, 2021.[9] Commerce determined that GreenFirst's acquisition involved the purchase of assets, as opposed to the purchase of a firm, and that RYAM continues to operate.[10] Commerce explained that

---

[4] *See Order*.
[5] *See* GreenFirst's Letter, "GreenFirst Forest Products and Rayonier A.M. Request for Changed Circumstances Review," dated October 4, 2021 (CCR Request).
[6] *See Order*, 83 FR at 348-49; *see also Certain Softwood Lumber Products from Canada: Final Results of the Countervailing Duty Administrative Review; 2017–2018*, 85 FR 77163, 77167 (December 1, 2020); *Certain Softwood Lumber Products from Canada: Notice of Amended Final Results of the Countervailing Duty Administrative Review, 2019*, 87 FR 1114, 1117 (January 10, 2022); and *Certain Softwood Lumber Products from Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 FR 48455, 48459 (August 9, 2022).
[7] *See* CCR Request at 8.
[8] *See* Decision Letter.
[9] *See* CCR Request at 4-6.
[10] *See* Decision Letter.

GreenFirst's purchase of the newsprint mill and six sawmills from RYAM constitutes a significant change that could have affected the nature and extent of GreenFirst's level of subsidization, and therefore, it would be inappropriate to simply apply to GreenFirst the cash deposit rate applicable to RYAM.[11]  Thus, in accordance with Commerce's significant changes practice regarding successorship, as articulated in *Pasta from Turkey*,[12] Commerce declined to initiate a CVD CCR for GreenFirst.

On January 18, 2022, GreenFirst submitted a request for reconsideration.[13]  On February 24, 2022, Commerce again determined, for the same reasons articulated in the Decision Letter, not to initiate GreenFirst's request for a CVD CCR.[14]  Subsequently, GreenFirst challenged before this Court Commerce's decision to not conduct a CVD CCR.

### B.  REMAND OPINION

In its *Remand Order*, the CIT stated that it is unclear why Commerce's significant changes practice applies to the facts of GreenFirst's request for a CVD CCR, where the predecessor company, RYAM, was not previously individually examined and received the all-others rate in the investigation and the non-selected rate in subsequent administrative reviews. The Court explained:

> In denying the request for a CCR Commerce invokes its *Pasta from Turkey* practice explaining when a significant change is present Commerce finds it "inappropriate to affirm a cash deposit rate that had been calculated during a previous time period based upon a significantly different fact pattern." … As explained in *Pasta from Turkey* and *Marsan*, the practice applies when a successor-in-interest stands to inherit a company's individually-calculated rate.  Implicit in Commerce's explanation is that the rate is a function of RYAM's actual level of subsidization

---

[11] *Id*. at 2.
[12] *See Certain Pasta from Turkey:  Preliminary Results of Countervailing Duty Changed Circumstances Review*, 74 FR 47225 (September 15, 2009) (*Pasta from Turkey Preliminary Results*), unchanged in *Certain Pasta from Turkey: Final Results of Countervailing Duty Changed Circumstances Review*, 74 FR 54022, (October 21, 2009) (*Pasta from Turkey Final Results*), and accompanying Issues and Decision Memorandum (collectively, *Pasta from Turkey*).
[13] *See* GreenFirst's Letter, "GreenFirst Forest Products and Rayonier A.M. Request for Reconsideration," dated January 18, 2022.
[14] *See* Reconsideration Letter.

3

which is unique to RYAM and not necessarily applicable to GreenFirst. As GreenFirst points out, however, Commerce calculated RYAM's rate by averaging the rates of non-selected companies, and not by individually examining RYAM.[15]

The CIT found that, because RYAM was not previously individually examined, it cannot discern why it would be reasonable for Commerce to apply its *Pasta from Turkey* significant changes practice to deny GreenFirst's request for a CVD CCR. Thus, the CIT remanded Commerce to either reconsider or further explain the basis for its determination that the significant changes practice applies where the predecessor company was not individually examined.

Pursuant to the *Remand Order*, we further explain, below, why Commerce's significant changes practice with regard to successorship, as articulated in *Pasta from Turkey*, applies in a CVD CCR where the predecessor company was not individually examined.

C.  **Draft Results of Redetermination**

Commerce released the Draft Results of Redetermination on January 12, 2023, explaining why its significant changes practice, as articulated in *Pasta from Turkey*, is applicable when considering whether to initiate a request for a CVD CCR regardless of whether the predecessor company was individually examined in a prior segment of the proceeding.[16] GreenFirst submitted timely comments on the Draft Results of Redetermination on January 19, 2023.[17]

---

[15] *See Remand Order* at 8-9.
[16] *See* Draft Results of Redetermination Pursuant to Count Remand, *GreenFirst Forest Products and GreenFirst Forest Products (QC) Inc. v. United States*, Court No. 22-00097, Slip Op. 22-126 (CIT November 18, 2022), dated January 12, 2023 (Draft Results of Redetermination).
[17] *See* GreenFirst's Letter, "GreenFirst Comments on Draft Results of Redetermination," dated January 19, 2023 (GreenFirst Comments).

**III.   ANALYSIS**

Section 751(b)(1) of the Tariff Act of 1930, as amended, directs Commerce to conduct a review of a final affirmative CVD determination when it receives a request from an interested party "which shows changed circumstances sufficient to warrant a review of such determination," but the statute does not define the term "changed circumstances."

Prior to October 2009, Commerce generally applied the same criteria it uses in conducting successor-in-interest analyses in antidumping duty (AD) changed circumstances proceedings to CVD changed circumstances proceedings.[18] In 2006, however, Commerce announced that it was going to consider whether it was appropriate to continue applying the AD successorship criteria in the context of CVD cases.[19] Subsequently, in 2007, Commerce published a *Federal Register* notice indicating that it was considering changing its practice concerning successorship analyses in the context of CVD cases, and requested comments.[20] After considering parties' comments, during the course of the 2009 *Pasta from Turkey* CVD CCR, Commerce promulgated a new approach to CVD CCRs that Commerce stated it intended to apply to future CVD CCR proceedings:

> {O}ur approach to CVD CCRs going forward will be as follows. As a general rule, in a CVD CCR, {Commerce} will make an affirmative CVD successorship finding (*i.e.*, that the respondent company is the same subsidized entity for CVD cash deposit purposes as the predecessor company) where there is no evidence of significant changes in the respondent's operations, ownership, corporate or legal structure during the relevant period (*i.e.*, the "look-back window") that could have affected the nature and extent of the respondent's subsidy levels.[21]

---

[18] *See Pasta from Turkey Preliminary Results*, 74 FR at 47226.
[19] *See Stainless Steel Sheet and Strip in Coils from the Republic of Korea: Preliminary Results of Countervailing Duty Changed Circumstances Review*, 71 FR 75937, 75940 (December 19, 2006) (stating Commerce "intends to further consider the issue of whether alternative or additional successorship criteria would be appropriate in the {countervailing duty} context, and therefore, {Commerce} anticipates releasing a separate *Federal Register* notice shortly hereafter inviting parties to submit public comments on the issue.") (emphasis omitted).
[20] *See Countervailing Duty Changed Circumstances Reviews; Request for Comment on Agency Practice*, 72 FR 3107 (January 24, 2007) (*Request for Comment*).
[21] *See Pasta from Turkey Preliminary Results*, 74 FR at 47227.

Subsequently, the Court held that Commerce has "discretion to construe the breadth of CCRs."[22]  As developed in *Pasta from Turkey*, and promulgated in response to comments responding to Commerce's *Request for Comment*, Commerce set forth specific successorship criteria for CVD CCRs because AD and CVD proceedings are focused on analytically distinct questions.[23]  Where AD proceedings focus on the extent to which a foreign producer or exporter has made sales at below fair value, CVD proceedings focus on the extent to which a foreign producer or exporter has been subsidized by their governments.  As such, an AD CCR analysis is concerned with the pricing behavior of a successor company, whereas a CVD CCR is concerned with the subsidization of the successor company and, therefore, the application of a different successor-in-interest methodology for CVD CCRs is appropriate.[24]

Commerce's practice regarding the successorship analysis in a CVD CCR, as articulated in *Pasta from Turkey*, is not to consider a company to be the successor-in-interest for cash deposit purposes when the requesting company has undergone significant changes that would require Commerce to fully assess the company's level of subsidization to determine the effects of the changes.  Hence, under this practice, Commerce will make an affirmative CVD successorship finding (*i.e.*, that the successor company is the same subsidized entity for CVD cash deposit purposes as the predecessor company) *only* where there is no evidence of significant changes in the requesting party's operations, ownership, corporate or legal structure.

In *Pasta from Turkey*, Commerce provided a non-exhaustive list of the changes it considers significant:  (1) changes in ownership, other than regular buying and selling of publicly owned shares held by a broad array of investors; (2) corporate mergers and acquisitions

---

[22] *See Marsan Gida Sanayi Ve Ticaret, AS v. United States*, 35 CIT 222, 228 (2011) (*Marsan*) (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)).
[23] *See Pasta from Turkey Preliminary Results*, unchanged in *Pasta from Turkey Final Results*.
[24] *See Pasta from Turkey Preliminary Results*, 74 FR at 47227, unchanged in *Pasta from Turkey Final Results*.

involving the respondent's consolidated or cross-owned corporate family and outside companies; and (3) purchases or sales of significant productive facilities.[25] In addition, under the practice, where a change occurs in a company's operations, ownership, corporate or legal structure that is not reflected in the non-exhaustive list, Commerce assesses whether the change could affect the nature and extent of the requesting company's subsidization. Commerce outlined objective criteria for this assessment, such as: (1) continuity in the cross-owned or consolidated respondent company's financial assets and liabilities; (2) continuity in its production and commercial activities; and (3) continuity in the level of the government's involvement in the respondent's operations or financial structure (*e.g.*, government ownership or control, the provision of inputs, loans, equity).[26]

These criteria determining whether a significant change affects the nature and extent of a company's subsidization apply whether or not the predecessor company was individually examined. If a successor company has undergone such significant changes that it would no longer receive the same level of subsidization as the predecessor company, it is essentially a different entity. This is a distinct issue from whether or not the predecessor company was individually examined. The crux of the CVD successor-in-interest methodology is not whether the predecessor company was individually examined but whether the successor company underwent significant changes in ownership, structure, and productive facilities, such that it is not the same entity as the predecessor company. In such circumstances where "significant changes" are present, it is not appropriate for the requesting company to inherit the cash deposit rate of essentially a different company. Rather, it is appropriate for the requesting company to be

---

[25] *See Pasta from Turkey Preliminary Results*, 74 FR at 47227-28, unchanged in *Pasta from Turkey Final Results*.
[26] *See Pasta from Turkey Preliminary Results*, 74 FR at 47228, unchanged in *Pasta from Turkey Final Results*.

7

assigned the all-others rate from the investigation.  Thus, the successor-in-interest analysis evaluates the changes to a company to determine whether those changes would make it appropriate to treat the former and subsequent company as if they were the same entity regardless of whether the predecessor company participated in the investigation or an administrative review.  Accordingly, an individually calculated rate assigned to a predecessor company is not requisite for a successor-in-interest analysis to be conducted in a CVD CCR.

Though the predecessor company examined in *Pasta from Turkey* was individually examined in a prior segment of the proceeding, there is no language within *Pasta from Turkey* that expressly limits Commerce's successor-in-interest analysis in CVD CCRs to cases in which the predecessor company was individually examined.  Moreover, there is nothing inherent in the approach or CVD-specific criteria, elucidated in *Pasta from Turkey*, that would limit the successor-in-interest methodology to companies with an individually calculated rate.  As Commerce intended, *Pasta from Turkey* expounds that in determining whether to conduct a CVD CCR, Commerce looks to whether a "significant change" occurred with the successor company and not whether the predecessor company was individually examined in a prior segment of the proceeding.  To that end, Commerce's analysis "will focus on whether a significant change occurred in the {successor} company's operations, ownership, corporate or legal structure and not whether those changes, in fact, ultimately did affect the respondent's subsidization or by how much."[27]  Thus, the successorship standard as set forth in *Pasta from Turkey* applies both when the predecessor company was individually examined and when it was not.

Having applied the successor-in-interest methodology to GreenFirst's CVD CCR request, Commerce determined that GreenFirst is not the same company as RYAM because a

---

[27] *See Pasta from Turkey Preliminary Results*, 74 FR at 47228, unchanged in *Pasta from Turkey Final Results*.

8

"significant change" had occurred in its corporate structure.[28] Accordingly, Commerce did not initiate the CCR request.[29] Commerce relied on the information provided in the CCR Request to make this determination. Commerce noted that GreenFirst's acquisition only involved the purchase of certain RYAM assets (*i.e.*, a newsprint mill and six sawmills) as opposed to the purchase of the entirety of RYAM.[30] Furthermore, Commerce found that RYAM, for which GreenFirst claims to be the successor-in-interest, continues to operate.[31] Indeed, RYAM now partially owns the parent company, GreenFirst Forest Products.[32]

As discussed in *Pasta from Turkey*, purchases or sales of significant productive facilities during the relevant period of the CVD CCR, which could affect the nature and extent of the countervailable subsidies attributable to the requesting company, are examples of significant changes that would preclude Commerce from conducting a CVD CCR.[33] As this Court noted in *Marsan*, "Commerce's methodology simply evaluates the changes to a company to determine whether those changes would make it inappropriate to treat the former and subsequent company as if they were the same entity and entitled to the same cash deposit rate."[34] Thus, on the basis of the evidence submitted by GreenFirst in its CCR Request, Commerce concluded that GreenFirst's purchase of assets from RYAM constitutes a "significant change" under the successor-in-interest methodology set forth in *Pasta from Turkey*. Given that a "significant change" occurred, it is inappropriate for GreenFirst to inherit the cash deposit rate assigned to RYAM, regardless of whether RYAM was individually examined, because GreenFirst and RYAM are not the same company.

---

[28] *See* Decision Letter; *see also* Reconsideration Letter.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *See Pasta from Turkey Preliminary Results*, 74 FR at 47227-28, unchanged in *Pasta from Turkey Final Results*.
[34] *See Marsan*, 35 CIT at 231 (emphasis in original).

## IV.     INTERESTED PARTY COMMENTS

As noted above, Commerce released the Draft Results of Redetermination on January 12, 2023.[35] GreenFirst submitted comments on January 19, 2023.[36] The arguments presented by GreenFirst are addressed below.

*GreenFirst Comments*[37]

- When the Court rejected Commerce's reasons for not initiating a CCR for GreenFirst, it held that Commerce's application of *Pasta from Turkey* in this case was unreasonable because, inherent in the *Pasta from Turkey* practice is that Commerce has calculated an individual subsidy rate for the predecessor company, which Commerce did not do in this case.

- Commerce should revise the Draft Results of Redetermination and initiate a CCR because its reasoning for not initiating/conducting a CVD CCR ignores (a) the Court's holding that *Pasta from Turkey* applies when a company stands to inherit a company's individually-calculated rate; and (b) the purpose of the *Pasta from Turkey* practice, which is to avoid CCRs when significant changes exist that affect the previously determined nature and extent of a company's subsidization (*i.e.*, when the predecessor company has an individually-calculated rate).

- Because the *Pasta from Turkey* practice exists to foreclose a CCR where there has been a significant change that could impact the rate of subsidization, its foundation is that there be an individually calculated subsidy rate for the predecessor company. If there is no individually-calculated rate, then there can be no concern of transferring one company's

---

[35] *See* Draft Results of Redetermination.
[36] *See* GreenFirst Comments.
[37] *Id.*

10

level of subsidization to another company that experienced significant changes that could have affected the nature and extent of the respondent's subsidy levels.

- Without an individually-calculated rate for the predecessor company, there is no level of subsidization that could be affected by changes in a successor company. Citing *Pasta from Turkey* and its affirmance of that practice in *Marsan*, the Court recognized this precondition when it held that "the practice applies when a successor-in-interest stands to inherit a company's individually-calculated rate."[38]

- The Court already rejected Commerce's argument that the *Turkey from Pasta* analysis applies regardless of whether the company has been individually examined. Commerce simply repeats that whether there has been a significant change is a "distinct issue from whether or not the predecessor company was individually examined,"[39] but fails to explain how a practice that was created to prevent a successor company from inheriting a rate reflective of a predecessor company's level of subsidization can apply when the predecessor company's level of subsidization was never determined.

- It is arbitrary and unreasonable to apply *Pasta from Turkey*, a practice built upon avoiding the improper transfer of an individual subsidy rate from one company to another, to a situation where a predecessor company never received an individual subsidy rate.

- Commerce wrongly stated that there is "no language within *Pasta from Turkey* that expressly limits Commerce's successor-in-interest analysis…to cases in which the predecessor company was individually examined."[40] In *Pasta from Turkey*, Commerce

---

[38] *Id*. at 3 (citing *Remand Order* at 9).
[39] *Id*. at 5 (citing Draft Results of Redetermination at 7).
[40] *Id*. (citing Draft Results of Redetermination at 7-8).

explained that "the limited purpose of a CVD CCR generally is to determine whether a company is essentially the same subsidized entity as the alleged predecessor company for *cash deposit purposes*."[41]  This practice assumes that there was a cash deposit rate that reflected the respondent's existing subsidy levels and declared that significant changes affecting the nature and extent of the subsidization that led to that individual rate would require Commerce to "reconsider" the previously established subsidy levels.  Underlying the language in *Pasta from Turkey* is the understanding that the predecessor company had an individually-calculated subsidy rate.[42]

**Commerce's Position:**  We find that GreenFirst did not present any new arguments that warrant Commerce to reconsider the Draft Results of Redetermination, and we continue to decline to initiate a CCR.

As an initial matter, we disagree with GreenFirst that the Court held that the *Pasta from Turkey* practice only applies when a successor-in-interest stands to inherit a company's individually-calculated rate and that the Court rejected Commerce's application of the *Pasta from Turkey* criteria as unreasonable in this case.[43]  Contrary to GreenFirst's assertion, the Court did not make such a determination.  Rather, in the context of understanding why Commerce's significant changes practice applies here, the Court, in its opinion, stated:  "{a}s explained in *Pasta from Turkey* and *Marsan*, the practice applies when a successor-in-interest stands to inherit a company's individually-calculated rate."[44]  The Court further explained that "{i}n this case {in which the predecessor company was not individual examined} it is unclear from Commerce's

---

[41] *Id*. (citing *Pasta from Turkey Preliminary Results*, 74 FR at 47227 (emphasis added)).
[42] *Id*. at 6-7 (citing *Pasta from Turkey Preliminary Results*, 74 FR at 47227; and *Marsan*, 35 CIT at 229 and 231).
[43] *See* GreenFirst Comments at 1 and 3-4 (citing *Remand Order* at 9).
[44] *See Remand Order* at 9.

explanation why its significant changes practice applies."[45]  The Court then opined that the reasonableness of Commerce's practice depends on its rationale and remanded to Commerce for further explanation the basis for its determination that its significant changes practice applies where the predecessor company was not individually examined, or reconsider.[46]

Therefore, within the Draft Results of Redetermination, we further explained why Commerce's significant changes practice, as articulated in *Pasta from Turkey* and upheld in *Marsan*, is applicable when considering whether to initiate a request for a CVD CCR when the predecessor company was not individually examined.[47]  We expounded on the fact that whether a predecessor company was, or was not, individually examined in a prior segment of a proceeding has no bearing on whether Commerce will initiate and conduct a CVD CCR requested by the alleged successor company.[48]  Upon receipt of a CVD CCR request, the consideration before Commerce is not whether the predecessor company was assigned an individually-calculated subsidy rate, but rather whether a significant change occurred (*i.e.*, changes to the company's operations, ownership, corporate or legal structure) affecting the level of subsidization such that it is not appropriate for the requesting company to inherit the cash deposit rate of essentially a different company, as articulated in *Pasta from Turkey*.

GreenFirst argues that "there is no reason for the *Pasta from Turkey* practice to exist when the predecessor company has no individually-calculated rate."[49]  In support of its argument, GreenFirst notes, in *Pasta from Turkey*, Commerce stated that "the limited purpose of a CVD CCR generally is to determine whether a company is essentially the same subsidized

---

[45] *Id.* at 8.
[46] *Id.* at 9-10.
[47] *See* Draft Results of Redetermination at 4-9.
[48] *Id.*
[49] *See* GreenFirst Comments at 3.

entity as the alleged predecessor company for cash deposit purposes,"[50] which GreenFirst contends indicates an understanding that the predecessor company has an individually-calculated subsidy rate.  We find that such arguments demonstrate GreenFirst's misunderstanding of the *Pasta from Turkey* practice.

Commerce's practice regarding the successorship analysis in a CVD CCR is not to consider a company to be the successor-in-interest for cash deposit purposes when the requesting company has undergone significant changes that would require Commerce to fully assess the successor company's level of subsidization to determine the effects of the changes.[51]  Under this practice, Commerce will make an affirmative CVD successorship finding (*i.e.*, that the successor company is the same subsidized entity for CVD cash deposit purposes as the predecessor company) *only* where there is no evidence of significant changes in the requesting party's operations, ownership, corporate or legal structure.[52]  In *Pasta from Turkey*, Commerce provided a non-exhaustive list of the changes it considers significant:  (1) changes in ownership, other than regular buying and selling of publicly owned shares held by a broad array of investors; (2) corporate mergers and acquisitions involving the respondent's consolidated or cross-owned corporate family and outside companies; and (3) purchases or sales of significant productive facilities.[53]  These criteria, which determine whether a significant change affects the nature and extent of a company's subsidization, apply regardless of whether the predecessor company was individually examined.  As underscored in the Draft Results of Redetermination:  "The crux of the CVD successor-in-interest methodology is not whether the predecessor company was individually examined but whether the successor company underwent significant changes in

---

[50] *Id.* at 5 (citing *Pasta from Turkey Preliminary Results*, 74 FR at 47227).
[51] *See Pasta from Turkey Preliminary Results*, 74 FR at 47227-28, unchanged in *Pasta from Turkey Final Results*.
[52] *Id.*
[53] *Id.*

ownership, structure, and productive facilities, such that it is not the same entity as the predecessor company."[54] As was demonstrated in GreenFirst's own request for a CVD CCR, significant changes took place such that it was not the same entity as RYAM for cash deposit purposes.

GreenFirst, however, attempts to divert attention from *Pasta for Turkey's* focal point of "significant changes" that may affect the respondent's level of subsidization to an individually-calculated subsidy rate by asserting that "inherent" in the *Pasta from Turkey* practice is that Commerce has calculated an individual subsidy rate for the predecessor company.[55] However, if Commerce's intent was for the significant changes practice, articulated in *Pasta from Turkey*, to apply only when the predecessor company has an individually-calculated rate, it would have stated so. Commerce thus is in no way precluded from applying its *Pasta from Turkey* practice both when the predecessor company was individually examined, and when it was not. Moreover, in *Pasta from Turkey*, Commerce was unequivocal that its successor-in-interest methodology was to be the standard for all CVD CCRs, stating:

> With this in mind, our approach to CVD CCRs going forward will be as follows. As a general rule, in a CVD CCR, the Department will make an affirmative CVD successorship finding (*i.e.*, that the respondent company is the same subsidized entity for CVD cash deposit purposes as the predecessor company) where there is no evidence of significant changes in the respondent's operations, ownership, corporate or legal structure during the relevant period (*i.e.*, the "look-back window") that could have affected the nature and extent of the respondent's subsidy levels.[56]

It was, therefore, neither arbitrary nor unreasonable, as GreenFirst claims, for Commerce to apply its *Pasta from Turkey* practice when considering whether to initiate the CVD CCR requested by GreenFirst. In accordance with the CVD successor-in-interest methodology, and

---

[54] *See* Draft Results of Redetermination at 7.
[55] *See* GreenFirst Comments at 4.
[56] *See Pasta from Turkey Preliminary Results*, 74 FR at 47227-28, unchanged in *Pasta from Turkey Final Results*.

the evidence submitted by GreenFirst in its CCR Request, Commerce properly concluded that GreenFirst's purchase of assets from RYAM constitutes a "significant change" and, thus, declined to initiate a CVD CCR for GreenFirst.

## V.     FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, Commerce has further explained why its significant changes practice, as articulated in *Pasta from Turkey*, is applicable when considering whether to initiate a request for a CVD CCR regardless of whether the predecessor company was individually examined in a prior segment of the proceeding.

2/14/2023

X _____

Signed by: International Trade Administration

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations